IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 14-cr-00093-REB

UNITED STATES OF AMERICA

        **Plaintiff,**

v.

1. **ROSE M. HORNE,**

        **Defendant,**

---

## PLEA AGREEMENT AND STATEMENT OF FACTS RELEVANT TO SENTENCING

---

The United States of America, by and through Pegeen D. Rhyne, Assistant United States Attorney for the United States Attorney's Office for the District of Colorado (the "government"), and the defendant, Rose M. Horne ("Horne" or the "defendant"), personally and by counsel, David Johnson, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I.   AGREEMENT

1. The defendant agrees to plead guilty to: (1) Count 4 of the Indictment, charging her with mail fraud, in violation of 18 U.S.C. § 1341; and (2) a single-count information, charging her with engaging in a monetary transaction in proceeds derived from criminal activity, in violation of 18 U.S.C. § 1957.  The defendant further agrees to admit to the asset forfeiture allegations in the Indictment.

**Court's Exhibit**

**1**

2. With respect to the single-count Information, the defendant explicitly waives any and all statute-of-limitations defenses. *See Musacchio v. United States*, 136 S.Ct. 709, 717 (2016) (holding that the statute of limitations "imposes a nonjurisdictional defense that becomes part of a case only if a defendant raises it in the district court."). It is the government's position that the statute of limitations was tolled during the time that the defendant was a fugitive.  *See United States v. Morgan*, 922 F.2d 1495, 1498 (10th Cir 1991)

3. The defendant agrees to pay the $200 special monetary assessment applicable to these counts at or before the time of sentencing.

4. The defendant agrees that her sentence will include an order of restitution in an amount up to $982,115.87 payable to the victim company.

5. The defendant reserves the right to request a variant sentence.  The government anticipates opposing any such request.

6. The government agrees to dismiss Counts 1 through 3 and 5 through 17 of the Indictment at the time of sentencing.

7. Provided that the defendant does not do anything that is inconsistent with accepting responsibility prior to sentencing, the government agrees that the defendant shall be awarded the additional 1-level reduction for acceptance of responsibility, pursuant to Section 3E1.1(b) of the Sentencing Guidelines, at the time of sentencing, without further motion, if the defendant's adjusted offense level is at least 16.

8. The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  Understanding this, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution,

conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upwardly, or (3) the Court determines that the total offense level, after the 3-level reduction for acceptance of responsibility, is higher than 19 and imposes a sentence above the sentencing guideline range for a total offense level of 19. Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.   The defendant also knowingly and voluntarily waives her right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255.   This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct.   Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

9. <u>Forfeiture of Assets:</u>   The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture as proceeds of the scheme set forth in the indictment, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere.   The assets to be

forfeited include, but are not limited to: a money judgment in the amount of up to $982,115.87.   The defendant agrees and consents to the forfeiture of the money judgment and any other assets subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) in any federal criminal, civil, and/or administrative forfeiture action.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offenses to which defendant is pleading guilty.   Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the Court find that the government has established the requisite nexus and enter a preliminary order of forfeiture.

The defendant agrees fully to assist the government in the recovery and return to the United States of any assets, or portions thereof, that are subject to forfeiture wherever located.   The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.   The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C.

§ 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the requirements set forth in 28 C.F.R. pt. 9 are met.   The defendant understands that the United States Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

10. This plea agreement is made pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure.

## II.   ELEMENTS OF THE OFFENSE

11. The parties agree that the elements of the mail fraud offense charged in Count 4 of the Indictment to which this plea is being tendered are as follows:

    A.    The defendant devised a scheme to defraud;

    B.    The defendant acted with specific intent to defraud;

    C.    The defendant mailed, or caused another person to mail, something through a private or commercial carrier for the purpose of carrying out the scheme; and

    D.    The scheme employed false or fraudulent pretenses, representations, or promises that were material.[1]

12. The parties agree that the elements of the offense of engaging in a monetary transaction in proceeds derived from criminal activity charged in the single-count Information to which this plea is being tendered are as follows:

    A.    The defendant knowingly engaged in a monetary transaction

---

[1] Tenth Circuit Pattern Jury Instructions (Criminal Cases), 2011, § 2.56 (updated 2018).

        affecting interstate commerce;

   B.   The monetary transaction was in property derived from specified unlawful activity, to wit, mail fraud;

   C.   The value of the criminally derived property exceeded $10,000;

   D.   The defendant knew the transaction involved criminally derived property; and

   E.   The monetary transaction took place within the United States.[2]

### III. STATUTORY PENALTIES

13. The maximum statutory penalty for a violation of 18 U.S.C. § 1341 is: not more than 20 years of imprisonment, a fine of not more than the greater of $250,000 or twice the gain or loss from the offense, or both; not more than 3 years of supervised release; a $100 special assessment fee; plus up to $982,115.87 in restitution.

The maximum statutory penalty for a violation of 18 U.S.C. § 1957 is: 10 years of imprisonment; a fine of not more than $250,000, or both; 3 years of supervised release, and a $100 special assessment fee.

Accordingly, the total maximum statutory penalty for both counts of the Information is: not more than 30 years of imprisonment; a fine of not more than the greater of $500,000 or twice the gain or loss from the offense, or both; not more than 3 years of supervised release; a $200 special assessment fee; plus up to $982,115.87 in restitution.

14. If probation or supervised release is imposed, a violation of any condition

---

[2] In the absence of a Tenth Circuit Pattern Jury Instruction for this statute, these elements were found in Federal Jury Practice and Instructions, 6th Cir., 2019, § 11.06.

of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV.   COLLATERAL CONSEQUENCES

15.   The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.   STIPULATION OF FACTS

16.   The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

17.   This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

18.   The parties agree that the date on which relevant conduct began in the month of October 2005.

19.   The parties agree as follows:

### Mail Fraud

As of June 2011, defendant Horne had been employed for 31 years by a small,

Case 1:14-cr-00093-REB   Document 40   Filed 05/05/21   USDC Colorado   Page 8 of 15

family-run plumbing business located in Fort Collins, Colorado.   For at least the last 12 years of her employment, defendant Horne was the bookkeeper for this company.   In this capacity, Horne had access to blank checks belonging to her employer, but she did not have signatory authority on the corresponding bank accounts.   From at least October 2005 through June 2011, defendant Horne fraudulently used these blank checks to steal $1,000,624.29 from her employer.   Specifically, defendant HORNE wrote approximately 170 unauthorized checks to herself from her employer's payroll account, totaling approximately $122,439.15.   Additionally, defendant HORNE intentionally took advantage of the fact that she had personal credit card accounts with Chase knowing that her employer also had a business credit card account with Chase.   Defendant HORNE wrote unauthorized checks on her employer's general business accounts, totaling more than $700,000, to pay her Chase personal credit card account balances, often paying more than the balance due so that she would have a credit remaining.   When she wrote these unauthorized checks to Chase, defendant Horne intentionally deceived her employer into believing that these checks were written to pay bills associated with her employer's business credit card account with Chase.   Defendant Horne also wrote other unauthorized checks on her employer's general business accounts to pay her other personal bills.   Horne quit her job in June 2011, and her employer first discovered Horne's fraud in October 2011.   **(The defendant reserves the right to dispute the total figures in this paragraph.).**

Because defendant Horne was not a signatory on her employer's bank accounts, defendant Horne sometimes forged the signatures on these checks.   Other times, defendant Horne presented the checks to S.M. or D.C., who were the two authorized

family-run plumbing business located in Fort Collins, Colorado.   For at least the last 12 years of her employment, defendant Horne was the bookkeeper for this company.   In this capacity, Horne had access to blank checks belonging to her employer, but she did not have signatory authority on the corresponding bank accounts.   From at least October 2005 through June 2011, defendant Horne fraudulently used these blank checks to steal $1,000,624.29 from her employer.   Specifically, defendant HORNE wrote approximately 170 unauthorized checks to herself from her employer's payroll account, totaling approximately $122,439.15.   Additionally, defendant HORNE intentionally took advantage of the fact that she had personal credit card accounts with Chase knowing that her employer also had a business credit card account with Chase.   Defendant HORNE wrote unauthorized checks on her employer's general business accounts, totaling more than $700,000, to pay her Chase personal credit card account balances, often paying more than the balance due so that she would have a credit remaining.   When she wrote these unauthorized checks to Chase, defendant Horne intentionally deceived her employer into believing that these checks were written to pay bills associated with her employer's business credit card account with Chase.   Defendant Horne also wrote other unauthorized checks on her employer's general business accounts to pay her other personal bills.   Horne quit her job in June 2011, and her employer first discovered Horne's fraud in October 2011.   **(The defendant reserves the right to dispute the total figures in this paragraph.).**

Because defendant Horne was not a signatory on her employer's bank accounts, defendant Horne sometimes forged the signatures on these checks.   Other times, defendant Horne presented the checks to S.M. or D.C., who were the two authorized

signatories on the accounts, for a signature while deceiving them into believing the checks were for the purpose of paying her employer's bills.

Defendant Horne sometimes tried to conceal her fraudulent use of her employer's checks by writing "void" on the corresponding check stubs, tearing the corresponding check stubs, or falsely writing on the corresponding check stubs the name of one of her employer's actual vendors.   Defendant HORNE also occassionally tried to conceal her fraudulent use of her employer's checks by cutting and blacking out from her employer's bank statements the copies of the checks in question.

In March 2012, after she knew her fraud had been discovered, Horne mailed D.C. a cashier's check for $18,508.42 as a partial repayment of the funds that she stole from his business.

**Mailing in Count 4:** For the purpose of furthering her scheme to defraud her employer, on October 30, 2009, defendant Horne placed in the mail C & B Check No. 10063 for $10,000 and caused it to be sent from Colorado to Cardmember Services at Chase for the purpose of paying Horne's personal credit card bill with her employer's funds.

### Monetary Transaction in Criminally Derived Proceeds

As described above, as part of her scheme to defraud, defendant Horne wrote unauthorized checks on her employer's general business accounts to pay her Chase personal credit card account balances, often paying more than the balance due so that she would have a credit remaining.   Indeed, during at least all of 2009, the only payments that defendant Horne made on her Chase personal credit card account were from unauthorized checks on her employer's general business accounts.   On March 2

signatories on the accounts, for a signature while deceiving them into believing the checks were for the purpose of paying her employer's bills.

Defendant Horne sometimes tried to conceal her fraudulent use of her employer's checks by writing "void" on the corresponding check stubs, tearing the corresponding check stubs, or falsely writing on the corresponding check stubs the name of one of her employer's actual vendors.   Defendant HORNE also occassionally tried to conceal her fraudulent use of her employer's checks by cutting and blacking out from her employer's bank statements the copies of the checks in question.

In March 2012, after she knew her fraud had been discovered, Horne mailed D.C. a cashier's check for $18,508.42 as a partial repayment of the funds that she stole from his business.

**Mailing in Count 4:** For the purpose of furthering her scheme to defraud her employer, on October 30, 2009, defendant Horne placed in the mail C & B Check No. 10063 for $10,000 and caused it to be sent from Colorado to Cardmember Services at Chase for the purpose of paying Horne's personal credit card bill with her employer's funds.

### Monetary Transaction in Criminally Derived Proceeds

As described above, as part of her scheme to defraud, defendant Horne wrote unauthorized checks on her employer's general business accounts to pay her Chase personal credit card account balances, often paying more than the balance due so that she would have a credit remaining.   Indeed, during at least all of 2009, the only payments that defendant Horne made on her Chase personal credit card account were from unauthorized checks on her employer's general business accounts.   On March 2

and 12, 2009, defendant Horne wrote unauthorized check numbers 33201 and 33212 from her employer's general business account each in the amount of $10,000 to "Cardmember Services."  Horne sent these two checks to Chase as payments on her personal credit card account, and both were posted to her account by March 15, 2009. On April 15 and 24, 2009, Horne wrote unauthorized check numbers 33318 and 33383 from her employer's general business account in the amounts of $10,000 and $6,000, respectively, to "Cardmember Services."  Horne sent these two checks to Chase as payments on her personal credit card account, and both were posted to her account by April 30, 2009.  On April 14, 2009, defendant Horne wrote check number 1346 drawn on her Chase personal credit card account in the amount of $20,000 that was payable to herself, and defendant Horne deposited this check into her personal savings account at Public Service Credit Union on the same day and while in Colorado.  This $20,000 check was charged to defendant Horne's Chase personal credit card account on April 14, 2009, and was paid for by the four unauthorized checks described above.  At the time that defendant Horne deposited this $20,000 check, defendant Horne knew that it was proceeds derived from her mail fraud scheme of using unauthorized checks drawn on her employer's accounts.  This monetary transaction affected interstate commerce because check 1346 was payable through Chase BankCard Services, Inc. in Westerville, Ohio.

## VI.   ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

20.   The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing

range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies in bold the matters which are in dispute, if any.

Pursuant to Section 2S1.1, Application Note 6, Count 4 and the single count in the Information are grouped together because the criminally derived funds at issue in the count in the Information are derived from Count 4. Thus, whichever count results in the highest offense level should be used. This will turn on the Court's findings regarding the requested enhancement for abuse of position of trust under Section 3B1.3 as set forth below.

### Mail Fraud

A. The base guideline is § 2B1.1, with a base offense level of 7.

B. A 14-level enhancement applies because the loss was more than $550,000 but less than $1,500,000, resulting in an offense level of 21. §2B1.1(b)(1)(J).

C. Pursuant to Section 3B1.3, a 2-level enhancement is applied for abuse of position of trust, resulting in an offense level of 23. **The defendant disputes the application of this enhancement.**

### Single-Count Information:

### Monetary Transaction in Proceeds from Mail Fraud

D. Pursuant to application note 2(C) under Section 2S1.1 combined

    with Section 3D1.3(a), no adjustments should be made as a result of the money laundering count in this case because the mail fraud calculation with Chapter 3 enhancements results in the highest offense level of the grouped counts.   **This would change if the Court does not apply the 2-level enhancement for abuse of position of trust.   If that happens, a 1-level enhancement should be applied pursuant to Section 2S1.1(b)(2)(A), which would result in an offense level of 22.**

E.  If the government prevails regarding the abuse of position of trust enhancement, the adjusted offense level would be 23.

F.  The defendant should receive a 3-level downward adjustment for timely acceptance of responsibility.   If the government prevails regarding the abuse of position of trust enhancement, the resulting offense level would be 20.

G.  The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

H.  The career offender/criminal livelihood/armed career criminal adjustments would not apply.

I.  If the government prevails regarding the abuse of position of trust enhancement, the advisory guideline range resulting from these

calculations is 33-41 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 30 months (bottom of Category I with an offense level of 19—if the defendant persuaded the Court not to impose the abuse of position of trust enhancement) to 87 months (top of Category VI with an offense level of 20). The guideline range would not exceed, in any case, the statutory maximum applicable to the count of conviction.

J. Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be either $10,000 to $100,000 or $15,000 to $150,000, plus applicable interest and penalties.

K. Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year, but not more than 3 years.

L. Pursuant to guideline §5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victims' losses, which the parties agree will be an amount of up to $982,115.87.

21. The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

22. No estimate by the parties regarding the guideline range precludes either

party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

23. The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

24. This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

| 4/15/21 | *Rose M. Horne* |
|---|---|
| Date | ROSE M. HORNE |

|                | Defendant |
|----------------|-----------|
| 4/15/21        | *David E. Johnson* |
| Date           | DAVID JOHNSON |
|                | Attorney for Defendant HORNE |
| 4/22/21        | *[signature]* |
| Date           | PEGEEN D. RHYNE |
|                | Assistant U.S. Attorney |